## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## DEL RIO DIVISION

| | |
|---|---|
| **THOMAS REES, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE INTERESTS OF BROOKE N. REES, DECEASED, STEVEN W. NAYLOR, AND DANA M. NAYLOR,**<br><br>                    **Plaintiffs,**<br><br>**v.**<br><br>**DKM ENTERPRISES, LLC**<br><br>                    **Defendant.** | **Case No. 2:23-cv-56**<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFFS' ORIGINAL COMPLAINT

COME NOW, Plaintiffs Thomas Rees, Individually, and as Representative of Brooke N. Rees, Deceased, and Steven W. Naylor, Individually and Dana M. Naylor, Individually, and file this Original Complaint against Defendant DKM Enterprises, LLC, state and allege as follows:

## PARTIES

1.     Plaintiffs bring this action pursuant to Tex. Civ. Prac. Rem. Code §71.004, *et seq.* (Wrongful Death Statute) and are the only members of the class of individuals authorized to pursue a claim for wrongful death.

2.     Plaintiff, Thomas Rees as Representative of Brooke N. Rees, Decased, brings this action pursuant to Tex. Civ. Prac. Rem. Code §71.021, *et seq.* (Survival Statute).

3.     Plaintiff Thomas Rees is an individual over the age of 18 residing in Clemson, South Carolina. Thomas Rees is the surviving spouse of Decedent Brooke Rees.

4.     Plaintiff Thomas Rees was appointed Special Administrator on behalf of Decedent, Brooke Rees to pursue her Survival Act Claims on November 11, 2021.

5.     Plaintiff Steven Naylor is the surviving natural father of Decedent, Brooke Rees.

6.     Plaintiff Dana Naylor is the surviving natural mother of Decedent, Brooke Rees.

7.     Defendant DKM Enterprises, LLC (hereinafter "DKM") is a Texas limited liability company. At all times relevant hereto, DKM operated as a steel salvage company and wholesale distributor of used steel materials with its principal place of business in Texas. Defendant DKM may be served with process by serving its registered agent for service of process, Donald Mclaughlin Jr., 1941 W FM 2369, Uvalde, TX 78801 USA.

## AGENCY AND VICARIOUS RESPONSIBILITY

8.     At the time of the occurrences complained of herein, and at all times relevant, DKM was acting by and through its actual, ostensible, and/or apparent agents and employees, including by not limited to those persons involved in loading the subject pipes.

9.     At the time of the negligent acts complained of herein, and at all times relevant, DKM's actual, ostensible, and apparent agents, and employees, including but not limited to those persons involved in loading and securing the subject pipes, were acting within the course and scope of their agency or employment.

## JURISDICTION AND VENUE

10.     This District Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs. Plaintiff Thomas Rees is a citizen of South Carolina. Plaintiffs Dana Naylor and Steven Naylor are citizens of Georgia. Defendant DKM is a business citizen of Texas.

11.     Venue is proper under 28 USC § 1391(a)(1) because DKM is headquartered in this judicial district.

## FACTS

12.     In February 2021, DKM owned and operated a steel pipe decommissioning, excavating, refurbishing, and resale business and maintained four (4) pipe yards located in Texas and one (1) pipe yard located in Kansas, located at 1118 3400 Ave., Abilene, Kansas.

13.     In February of 2021, a third-party broker (the "broker") brokered a contract to purchase sixteen (16) 30-foot-long steel pipes (varying between 24" and 20" in diameter) from Defendant DKM for delivery to two (2) separate Missouri customers (hereinafter the "load").

14.     In February of 2021, the broker hired a contract carrier and/or driver (the "carrier" or the "driver") to haul the load from DKM's Abilene pipe yard to the two (2) Missouri customers.

15.     Specifically, the load was comprised of (2) separate purchase orders of steel pipe for two (2) separate customers located at different locations. The first purchase order

was for five (5) pieces of 24-inch diameter, 30-foot-long pipe and three (3) pieces of 20-inch diameter, 30-foot-long pipe. The second purchase order was for eight (8) 24-inch diameter, 30-foot-long pipes.

16.     Despite separate purchase orders, different drop-off locations, and the varying diameters of the pipes, DKM agreed and planned to load all sixteen (16) pipes onto a flatbed trailer to complete the sale to the third-party broker.

17.     On February 24, 2021, at approximately 1:15 p.m., the contract driver hired by the broker to transport the subject load arrived at DKM's pipe yard in Abilene.

18.     After the contract driver arrived, DKM employees, David Trevino (yard supervisor), Luis Velasquez, and Felix Flores, conducted a load plan meeting to discuss how they would configure, arrange, and stack the subject pipes onto the contract driver's flatbed trailer.

19.     During the load plan meeting, DKM exclusively decided that the pipes would be stacked (4) rows high and four (4) rows wide onto the contract driver's flatbed trailer.

20.     During the load plan meeting, DKM exclusively decided that the top layer of pipe would consist of three (3) 20-inch diameter pipes and one (1) 24-inch diameter pipe, which was configured as follows: 20' – 24' – 20' – 20' (from passenger's side to driver's side).

21.     DKM did not allow or ask the contract driver to participate in the load plan meeting.

22.    The only information DKM provided to the contract driver concerning the configuration or arrangement of the load was that there would be four (4) layers of pipes.

23.    On February 24, 2021, DKM, by and through its employees, loaded the subject pipes onto the flatbed trailer using a forklift, dunnage, and chocks.

24.    At all times relevant, DKM was exclusively responsible for how the pipes were loaded, configured and secured on the contract driver's trailer.

25.    Prior to the contract driver's arrival, DKM informed the broker that eight (8) pieces of wooden boards were required to be brought by the contract driver to be used for dunnage between the layers of pipe to safely load the pipes onto the flatbed trailer.

26.    On February 24, 2021, the contract driver arrived at DKM's yard with seven (7) pieces of 4" x 4" boards to act as dunnage. DKM supplied one (1) piece of dunnage.

27.    At all times relevant, DKM was exclusively responsible for determining all aspects of necessary dunnage to safely secure and transport the subject pipes.

28.    At all times relevant, DKM was exclusively responsible for determining the location of each piece of dunnage and physically placing the dunnage onto the contract driver's trailer and between each layer of pipe.

29.    On February 24, 2021, DKM utilized two (2) pieces of dunnage per layer, beginning with two (2) pieces of dunnage between the flatbed trailer and the first layer of pipes.

30.    Additionally, during the loading process, DKM cut twenty-eight (28) wooden triangles ("chocks") that DKM (reportedly) nailed on the ends of the eight (8)

pieces of dunnage to prevent lateral movement of the pipes during the loading process and during transit of the load.

31.    At all times relevant, DKM was exclusively responsible for supplying the chocks, selecting the type and number of chocks, determining the location of the chocks, deciding how many nails to use, and physically nailing the chocks to dunnage between each layer of pipe to prevent lateral movement of the pipes during the loading process and during transit of the load.

32.    On February 24, 2021, at approximately 1:15 p.m., DKM initiated the loading process and placed two (2) pieces of dunnage on the contract driver's trailer, nailed chocks to one side, and used forklifts to place the bottom layer of pipes.

33.    Once DKM loaded the first layer of pipes onto the trailer, DKM nailed chocks to the other side and instructed the driver to strap the first layer of pipes.

34.    The contract driver asked DKM how many straps to use, and DKM's employees instructed the contract driver that some drivers use one (1) strap and others use two (2).

35.    Accordingly, the contract driver placed two (2) straps over the first layer of pipe.

36.    DKM and the contract driver repeated this process for each of the next three (3) layers of pipe, including the top layer of pipes that differed in diameter. Unbeknownst to the contract driver, the straps securing the top layer of pipes to the trailer could never provide downward pressure to the inside 20" pipe due to DKM's loading configuration.

37.   On February 24, 2021, at approximately 2:25 p.m., DKM finished loading the pipes on the contract driver's trailer and the driver left the pipe yard.

38.   Despite DKM employees (DKM yard supervisor and person loading the pipes) knowing the load to be dangerous based on its configuration and lack of downward pressure on the inside 20" pipe, DKM employees allowed the trailer to leave the pipe yard without notifying a single person or entity or attempting to prevent the known dangerous load from leaving the lot.  In doing so, DKM employees violated DKM's own internal rules and policies requiring them to exercise their stop work authority.

39.   At approximately 4:20 p.m. on February 24, 2021, the contract driver was operating the negligently loaded and configured trailer on Interstate 70 in the inside eastbound lane near Topeka, Kansas.  At said time and place, the trailer approached a curve in the highway, which was less than ninety (90) miles away from DKM's pipe yard.

40.   Based on eyewitness testimony from a motorist traveling behind the trailer at or near this time and location, all the chocks on the rear pieces of dunnage (14 in total) had fallen off and were missing.

41.   As a direct result of DKM's loading practices, including but not limited its and configuration of the load and its utilization and/or placement of the dunnage and/or chocks, the load of pipes shifted, became dislodged from the trailer, and spilled into the eastbound and westbound lanes of Interstate 70 and the truck was traveling highway speeds.

42.     At said time and place, Decedent Brooke Rees was operating her 2020 Kia Forte in the westbound inside lane of Interstate 70. Multiple pipes struck and crushed Brooke Rees's Kia Forte.

43.     As a result of the aforementioned events, Brooke Rees suffered severe conscious pain and suffering, extreme emotional distress, mental anguish, fear, knowledge of impending death, and eventual death.

## RESPONSIBILITY—COUNT I
### Negligent Loading

44.     Plaintiffs hereby incorporate by reference paragraphs 1 – 43 above, as if specifically set forth herein in their entirety.

45.     At all times relevant, Defendant DKM, by and through its agents, employees, and/or representatives, owed Brooke Rees a duty to exercise ordinary care in loading the subject steel pipes onto the contract driver's flatbed trailer.

46.     At all times relevant, Defendant DKM's employees were acting within the course and scope of their agency and/or employment with Defendant DKM at the time the contract driver's trailer was improperly loaded by employees of Defendant DKM and thus, each owed Brooke Rees a duty to exercise an ordinary degree of care in loading the subject steel pipes onto the contract driver's flatbed trailer.

47.     On February 24, 2021, Defendant DKM failed to exercise an ordinary degree of care in loading the subject pipes on the contract driver's trailer and was thereby negligent and careless in one or more of the following respects:

a. In negligently, carelessly, and recklessly planning, configuring, and loading the pipes so as to create a situation in which a pipe with a larger diameter was placed on the top layer with three (3) smaller pipes, which prevented the application of downward force to the adjacent, smaller pipe;

b. In negligently failing to provide adequate training to its employees related to load planning and configuration of steel pipes;

c. In negligently failing to have any policies and/or procedures related to load planning and/or load configuration;

d. In negligently failing to warn the contract driver of the dangerous condition and/or hidden defect created by the negligent pipe configuration, negligent chock usage, and negligent dunnage usage;

e. In negligently failing to inspect and/or utilize the proper type, quality, and amount of dunnage necessary to safely load and/or haul the subject steel pipes;

f. In negligently failing to properly place the dunnage it chose to utilize in a safe and careful manner;

g. In negligently failing to provide sufficient dunnage;

h. In negligently failing to have any policies and/or procedures related to loading, load configuration, dunnage, including dunnage selection and/or placement;

i. In negligently failing to inspect and/or utilize the proper type, quality, and number of chocks necessary to prevent lateral movement of the pipes during the loading process and during transit of the subject load;

j. In negligently failing to properly cut and/or provide chocks that were of proper shape and/or material to prevent lateral movement of the pipes during the loading process and during transit of the subject load;

k. In negligently failing to properly nail the chocks to the dunnage;

l. In negligently using faulty and cracked wood as chocks and/or dunnage;

m. In negligently violating its own policies of utilizing two (2) nails to secure a chock to a piece of dunnage;

n. In negligently failing to properly place and/or secure the chocks to the dunnage;

o. In negligently failing to provide sufficient chocks and/or nails;

p. In negligently failing to have any policies and/or procedures related to chocks, including chock selection and placement;

q. In negligently failing to warn the contract driver of the dangerous condition and/or hidden defect(s) created by the inadequate dunnage and/or chocks;

r. In negligently failing to inspect the dunnage, chocks, and/or nails after DKM finished loading the subject pipes despite load configuration, chock and dunnage usage being DKM's exclusive responsibility;

s. In negligently loading the top layer of varying diameter pipes without providing the contract driver an opportunity to individually strap and/or secure the pipes;

t. In negligently instructing the contract driver to use two (2) straps per layer, including two (2) straps over the top layer of pipes of varying diameter, when DKM knew that two (2) straps over the top layer would not provide adequate downward pressure on the 20" diameter pipe that was adjacent to the 24" diameter pipe;

u. In negligently instructing the contract driver to use two (2) straps per layer, including two (2) straps over the top layer of pipes, when DKM knew that the number of straps it told the driver to use would not properly secure the pipes to the trailer;

v. In negligently instructing the contract driver to use two (2) straps per layer, including two (2) straps over the top layer of pipes, when DKM knew that the number of straps it told the driver to use would not properly secure the pipes to the trailer and in so doing it violated DKM rules and policies regarding the same;

w. In negligently failing to warn the contract driver of the hazardous condition created by DKM's configuration of the pipes, together with DKM's explicit instruction related to the number of straps;

x. In negligently failing to utilize multiple shipments to deliver the separate purchase orders;

y.  In negligently and carelessly violating DKM company rules and policies by failing to exercise the required stop work authority;

z.  Creating a dangerous and/or hazardous condition;

aa. Failing to properly instruct and/or train its employees;

bb. Failing to have adequate safety policies and procedures;

cc. Failing to adequately supervise, train, and/or instruct its employees;

dd. Failing to remedy a dangerous and/or hazardous condition;

ee. Vicarious liability for the conduct of its employees and agents;

ff. In negligently and carelessly loading the subject pipes in further particulars presently unknown to Plaintiffs but which are verily believed and alleged, will be disclosed during the course of this litigation.

48.    DKM's negligence, as set forth herein, was a proximate cause or otherwise contributed to the death of Brooke Rees.

49.    The injuries sustained by the Decedent and Plaintiffs as a result of the death of Brooke Rees were of a type reasonably foreseeable due to the negligence of Defendant DKM's employees, which Defendant DKM is vicariously liable for and should have known and/or prevented such occurrence.

## RESPONSIBILITY—COUNT II
### Violation of Company Policies

50.    Plaintiffs hereby incorporate by reference paragraphs 1 – 49 above, as if specifically set forth herein in their entirety.

51.    At all times relevant, DKM had a standing stop-work rule requiring DKM's yard manager and/or other employees to intervene and stop a load from leaving DKM's pipe yard if they believed it was dangerous or unsafe.

52.      At all times relevant, Defendant DKM, by and through its agents, employees, and/or representatives, owed Brooke Rees a duty to exercise ordinary care and follow DKM's company policies related to safe loading practices, load securement, and hazardous conditions.

53.      At all times relevant, David Trevino was employed by Defendant DKM in a managerial capacity and was the supervisor of DKM's Abilene pipe yard.

54.      DKM's manager, David Trevino, supervised the subject loading process and was the DKM employee who physically loaded the pipes onto the trailer by way of a forklift.

55.      DKM's manager, David Trevino, led the load plan meeting where the configuration of pipes was determined by DKM and specifically determined that the top layer would consist of three (3) 20-inch diameter pipes and one (1) 24-inch diameter pipe, which was configured as follows: 20" – 24"' – 20" – 20" (from passenger's side to driver's side).

56.      DKM's configuration of the pipes resulted in a hazardous situation where the two (2) straps it instructed the contract driver to use over the top layer, did not contact the 20" diameter pipe adjacent to the 24" diameter pipe, which resulted in the 20" pipe not secured by any downward force.

57.      At all times relevant, DKM's employees, including David Trevino, knew about the importance of ensuring there was a downward force on the pipes from the straps.

58.    At all times relevant, DKM's own policy required loads of people to be "uniform and squared" and for the straps that go over the load to be touching the pipes.

59.    Despite this knowledge and policy, DKM loaded the top layer of pipes just as it loaded the first, second, and third layers and did not notify and/or warn the contract driver of the unreasonably hazardous condition it created by configuring the top layer of pipes.

60.    After it finished loading the top layer of pipes and nailing the chocks to the dunnage between the third and fourth layers, DKM observed the contract driver utilize two (2) straps over the top layer, in accordance with the instructions provided by DKM's manager, David Trevino.

61.    Based on the configuration of the load's top layer, DKM knew that the load securement straps would not touch the 20" pipe adjacent to the taller 24" pipe on the top layer.

62.    Despite this knowledge, together with the understanding of the importance of ensuring that pipes are secured in all directions and that there was a downward force on all the pipes, DKM's employees allowed the contract driver to leave its pipe yard in Abeline without notifying and/or warning any person or entity of the unreasonably hazardous load.

63.    DKM's manager, David Trevino, knew the load created a danger to motorists before it departed the DKM yard—the sole danger being 21 tons of steel pipe falling off the trailer killing innocent motorists.

64.     DKM's standing stop-work rule required DKM's manager, David Trevino, to intervene and stop the subject load from leaving the yard if he thought it was dangerous.

65.     DKM's standing stop-work rule required DKM's manager, David Trevino, to warn and/or notify the contract driver about the load if he thought it was dangerous.

66.     DKM manager, David Trevino, recognized the subject load of pipes was dangerous before it left the DKM yard but chose to do nothing.

67.     DKM manager, David Trevino, DKM's manager acted in a careless and/or negligent manner and violated DKM's stop-work rule and/or policy by allowing the unreasonably hazardous load to leave the DKM yard in Abilene without taking any action.

68.     In so doing, DKM's manager, David Trevino, disregarded the safety of others, including Decedent, and failed to exercise ordinary care when he violated DKM's company policies related to safe loading practices, load securement, and hazardous conditions.

69.     As a direct and proximate result of DKM's negligence, including its manager's negligent and/or careless failure to follow DKM's company policies related to safe loading practices, load securement, and hazardous conditions, Plaintiffs sustained damages as set forth with more particularity in Paragraphs 47–51 of this Original Complaint.

## COUNT III
## Gross Negligence

70.    DKM willfully and wantonly disregarded Decedent's and Plaintiffs' safety and rights. DKM acted with flagrant and malicious disregard of Decedent's health and safety. DKM was subjectively aware of the extreme risk posed by the conditions that caused Decedent's death and injuries, but did nothing to rectify them. DKM did so knowing that the conditions posed dangerous and grave safety concerns. DKM's acts and omissions involved an extreme degree of risk considering the probability and magnitude of potential harm to Decedent and others similarly situated.  DKM had actual, subjective awareness of the risk, and consciously disregarded such risks. DKM's conduct constituted gross negligence.

## DAMAGES

71.    **Wrongful Death Damages.** Plaintiffs seek all damages allowed pursuant to the Wrongful Death Act, including past and future mental anguish, loss of companionship and society, and pecuniary losses (including loss of inheritance, income and benefits, lost household services, and financial support).

72.    **Survival Act Damages.** Had death not ensued, Brooke Rees would have been entitled to recover damages from DKM, including physical pain and suffering, mental anguish, knowledge of impending death, fear, emotional distress, medical, funeral and burial expenses.

73.    **Exemplary Damages.** Plaintiffs entitled to recover punitive damages seek such an award because of Defendant DKM's gross negligence.

## JURY DEMAND

74.     Plaintiffs respectfully demand a trial by jury on all claims.

## PRAYER

75.     Plaintiffs pray Citation issue and be served upon Defendant DKM in a form and manner prescribed by law, requiring that the Defendant DKM appear and answer, and that upon final hearing, Plaintiffs have judgment against Defendant DKM in a total sum in excess of the minimum jurisdictional limits of this Court, plus pre-judgment and post judgment interests, all costs of Court, punitive damages, and all such other and further relief, to which they may show themselves justly entitled.

76.     Plaintiffs seek monetary relief over $1,000,000.

**Respectfully submitted,**

**THE WEST LAW FIRM**

*/s/ S. Scott West*

**S. SCOTT WEST**
SBN: 21206920
FBN: 12156
6908 BRISBANE COURT, THIRD FLOOR
SUGAR LAND, TEXAS 77479
TEL: (281) 277-1500
FAX: (281) 277-1505
WestTeam@westfirm.com

**AND**

**BARTIMUS FRICKLETON
ROBERTSON RADER, P.C.**

**by:**    */s/ Michael C. Rader*
**MICHAEL C. RADER    MO #49117
AUSTIN W. GREEN    MO #72819
4000 W. 114th Street, Suite 310
Leawood, Kansas 66211
(913) 266-2300/ Fax (913) 266-2366**
mrader@bflawfirm.com
agreen@bflawfirm.com
**Pro Hac Vice Applications to follow**

**ATTORNEYS FOR PLAINTIFFS**